UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUCKY U, LLC<br>　　　*Plaintiff*,<br><br>　　　*v.*<br><br>S&F INVESTMENTS, LLC, A&V PETROLEUM, LLC and FADI QUMBARGI<br><br>　　　*Defendants*. | Civil No. 3:21cv931 (JBA)<br><br>January 11, 2022 |

**ORDER GRANTING DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Lucky U, LLC ("Lucky U"), of which Ms. Anuradha Gautam is currently the sole member, operates a gas station and convenience store which it leases from Defendant S&F Investments, LLC. Lucky U instituted this action against Defendants S&F Investments, LLC ("S&F"), A&V Petroleum, LLC, and Fadi Qumbargi, who is the sole member of the two LLCs (collectively "A&V"), seeking a declaratory judgment on the rights and responsibilities of the parties under their contracts and alleging Defendants' breach of three contracts, illusory contract, violations of the Connecticut Unfair Trade Practices Act, negligence, and fraud. (Am. Compl. [Doc. # 26] ¶¶ 13-57, 92-96.) Lucky U also requests recission/reformation of the parties' Fuel Supply Agreement, seeks accounting of funds received and expended for the benefit of Lucky U under the parties' contracts, and alleges that Defendants received funds from Lucky U "to which they are not entitled constitut[ing] a debt." (*Id.* ¶¶ 58-65, 76-91.) On September 27, 2021, Defendants answered Lucky U's Complaint and asserted affirmative defenses. (Answer [Doc. # 29].) Subsequently, Defendants requested leave to amend their answer to allege counterclaims, (Mot. to Am. Answer [Doc. # 31] at 1), which the Court granted [Doc. # 45]. Defendants have asserted two breach of contract counterclaims, a Connecticut Unfair Trade Practices claim, and a request for declaratory and injunctive relief. (Am. Answer [Doc. # 47].)

On October 21, 2021, Defendants moved for a preliminary injunction to enjoin Lucky U from (1) entering, occupying, or possessing the leased premises; (2) dispossessing or attempting to dispossess A&V from the leased premises; (3) attempting to access any computer, register, cashier, credit card system, account, accounting device, reconciliation device, environmental device or altering data on any of these devices; (4) attempting to prevent A&V from restoring the data on these devices; (5) communicating with Alliance Energy, LLC in an attempt to breach the Fuel Supply Agreement between Alliance Energy and A&V; (7) selling fuel that has not been sold by A&V; (8) selling or permitting the sale of counterfeit motor fuel or any fuel beyond Mobil fuel delivered by Alliance Energy, LLC; (9) allowing fuel to be sold without a trained attendant; (10) dispensing fuel without required reconciliation records; and (11) employing individuals without proof that it had obtained Worker's Compensation Insurance. (Emergency Appl. for Inj., Order to Show Cause, and Req. for Expedited Hr'g [Doc. # 33] at 11-13.) Lucky U opposes [Doc. # 54]. The Court held a two-day evidentiary hearing on A&V's motion on December 14-15, 2021 [Docs. ## 58, 61]. For the reasons that follow, Defendants' motion for a preliminary injunction is GRANTED in part.

I. **Background**

A. **Relevant Contracts**

Lucky U and Defendants are parties to three agreements with respect to the gas station that Lucky U leases at 83 Federal Road—an Agreement of Lease (the "Lease"), a Fuel Supply Agreement (the "Supply Agreement"), and a Key Money Agreement.

1. *The Lease*

On July 23, 2019,[1] Lucky U and S&F entered into a five-year lease, (Lease, Ex. 3, ¶ 1-2), under which Lucky U leases the "gas station and the convenience store, including

---

[1] While the Lease states that the agreement was made on July 23, 2019, Mr. Qumbargi maintains that the Lease was executed on August 13, 2019, pointing to his dated initials in the margin of the signature page. However, determination of the execution date of the Lease has no bearing on the merits of A&V's motion for a preliminary injunction.

underground fuel tanks, dispensers and canopy along with the associated equipment for dispensing fuel to vehicles." (*Id.* ¶ 1.) The use of the premises is restricted to the "operati[on of] a fuel service station for automobiles and light trucks and a convenience store." (*Id.* ¶ 3.) Lucky U is responsible for the interior and exterior maintenance and is required to "maintain the fueling equipment, including the dispensers and fuel pumps." (*Id.* ¶¶ 14, 36(w).) Lucky U cannot "construct or place signs, awnings, marquees, or other structures projecting from the exterior of the premises without the prior approval and written consent" of S&F. (*Id.* ¶ 13.)

By its terms, the "failure of [Lucky U] to comply with every term and condition of this lease" constitutes a breach of the Lease, as does the "failure of [Lucky U] to adhere to the Brand Indemnification and Minimum Standards required by the Brand." (*Id.* ¶ 25(d), (k).) After a thirty-day cure period, S&F has the right to "reenter" the premises, terminate the Lease on fifteen days' notice, and "re-let" the property. (*Id.* ¶ 26.)

### 2.   *The Supply Agreement*

On August 13, 2019, Lucky U and A&V entered into a Supply Agreement. (Fuel Supply Agreement, Ex. 4, at 1.) The Supply Agreement purports to create a "franchise relationship" under the Petroleum Marketing Practices Act (15 U.S.C. § 2081 *et seq.*), allowing Lucky U to purchase petroleum from A&V for resale at the Federal Road gas station for a period of ten years. (*Id.* at 1-2.) Under this agreement, Lucky U sells "Product," or gasoline and diesel, under the Mobil trademark, and cannot "mix, blend, dilute, adulterate, or contaminate" the "Product." (*Id.* at 2-3.)

Under the agreement, Lucky U is "solely responsible for compliance with all federal, state, and local statutes, rules and regulations regarding the handling and transmission of customer credit and debit card data, and all rules, regulations, instructions, and guidelines of the card issuer and credit and debit card industry relating thereto." (*Id.* at 5.) Lucky U's responsibility extends to the "installation and/or upgrading of all equipment, hardware, and

software necessary to timely comply with card issuer and industry standards and requirements for customer PIN and data entry devices," and it must provide A&V with "unrestricted access to all records of credit and debit card transactions." (*Id.*) If Lucky U fails to comply with the credit card requirements, A&V may "suspend its acceptance of credit and debit card sales." (*Id.*) Further, Lucky U is obligated to obtain worker's compensation insurance "where required by law," (*id.* at 6), and comply "with all applicable federal, state and local laws . . . governing (a) pollution, disposal of waste materials generated at the Premises, lead content, pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items." (*Id.* at 7.)

A&V can terminate the Fuel Supply Agreement if Lucky U, *inter alia*, breaches "any other provision of this Agreement, or of any other agreement between [Lucky U] and [A&V]" or violates federal, state, or local law." (*Id.* at 8-9.) Upon breach, A&V has the right to (1) terminate the Agreement, (2) "seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to [A&V]," (3) be paid for accounts receivable, (4) be paid for liquidated damages, (5) be paid for the amounts due to Mobil, and (6) recover the costs of collection. (*Id.* at 9.) Lucky U's authorization to use Mobil's trademark ends upon termination of the Supply Agreement and "all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks" must be returned or A&V "may enter the Premises and remove [the] same without notice and without liability." (*Id.*) Lucky U is also obligated to comply with A&V's "normal post-termination procedures as determined by [A&V]." (*Id.* at 4.)

### 3. *Key Money Agreement*

Lucky U and A&V also created a "Key Money Agreement." (Key Money Agreement, Ex. 5.) The Key Money Agreement allows Lucky U, in exchange for $105,000, to "take-over and

have the right to use said equipment and fixtures in the operation of the service station: Three (3) Wayne pumps 3+0; LED price sign; LED lights on canopy; Synergy signs, koalas; POS system register commander back-up batteries; [and] Display Racks." (*Id.*)

## B. Notice of Termination

On October 15, 2021, A&V issued a Notice of Termination to Lucky U pursuant to the Petroleum Marketing Practices Act stating that Lucky U's "petroleum marketing franchise" would be terminated on October 18, 2021. (Notice of Termination, Ex. 7.) The termination, given with less than ninety days' notice under 15 U.S.C. § 2804(b)(1), claimed that Lucky U engaged in a "pervasive and egregious pattern of ongoing and successive breaches as well as violations of law." (*Id.*) Specifically, A&V listed sixteen grounds for termination under 15 U.S.C. § 2802(b)(2)(A) because Lucky U

> (a) refus[ed] to permit necessary inspections for mandatory EMV upgrades; (b) refuse[d] to accept credit cards at gasoline dispensers; (c) us[ed] unauthorized credit card equipment; (d) fail[ed] to accept all credit cards required under the franchise; (e) fail[ed] to reconcile underground storage tank gasoline inventory on a daily and weekly basis; (f) fail[ed] to maintain gasoline inventory reconciliation records; (g) operat[ed] the service station without an attendant present; (h) s[old] impermissible items, including used items, clothing and drug paraphernalia; (i) intentional[ly] interfere[d] with the Fuel Supply Agreement between Alliance Energy LLC and, [sic] A&V Petroleum LLC which relates to the supply of motor fuels to 83 Federal Road Brookfield, Connecticut; (j) fail[ed] to maintain worker's compensation insurance; (k) . . . fail[ed] to perform EMV upgrade to comply with PCI Data Security Standards; (l) fail[ed] to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing (a) pollution, disposal of waste materials generated at the premises, lead content, pricing, product containers, branded adulteration, co-mingling an underground tank gauging requirement; and (b) sales of illegal, prohibited, restricted, or regulated goods or items; (m) fail[ed] to assure that all credit and debit card sales at the Premises were made in compliance with the instructions and regulations supplied by or through Company, or otherwise promulgated by the card issuer; (n) fail[ed] to comply with all rules, regulations, instructions and guidelines of the card issuers and credit and debit card industry relating to the PCI Data Security Standard; (o) fail[ed] to install or upgrade necessary equipment, hardware, and software necessary to timely comply with card issuer in industry standards and requirements; (p) fail[ed] to allow your franchisor, its agents, contractors, and

5

representatives unrestricted access to all records of credit and debit card transactions, receipts, and transmissions, at all such time as the company requested.

(*Id.*) A&V stated that Lucky U failed to "exert good faith efforts to carry out the provisions of the franchise" listed above, justifying termination under 15 U.S.C. § 2802(b)(2)(B). A&V also predicated termination under 15 U.S.C. § 2802(b)(2)(C) because Lucky U

(a) fail[ed] to maintain worker's compensation insurance in violation of Conn. Gen. Stat. § 31-284; (b) fail[ed] to comply with the Connecticut Flammable and Combustible Liquids Code Regs. Conn State Agen. § 29-320-4a subsection NFPA 30A, 9-.8 by dispensing liquids of the public service station without an attendant present; (c) block[ed] an exit from the service station in violation of the State Fire Prevention Code and Life Safety Code; (d) faile[d] to perform and maintain inventory records in violation of Regs. Conn. State Agen. §§ 22a-449(d)-104(b)(3); 22a-449(d)-104(e)(1) and 22a-449(d)-1(g).

(*Id.*) In addition, A&V deemed Lucky U's purported communication that it "would no longer purchase branded motor fuel"[2] an "express or anticipatory breach" and "further grounds for termination" under 15 U.S.C. § 2802(b)(2)(A)-(B). (*Id.*) A&V sought repossession of the premises after October 22, 2021 because the franchise agreement had been terminated. (*Id.*)

This was not Defendants' first attempt at terminating the franchise and repossessing the premises. On May 18, 2021, S&F notified Lucky U that Lucky U was in default of the Lease, giving Lucky U thirty days to cure defaults or it would "exercise its rights and remedies under the Lease, including summary process." (Default Letter, Ex. 15.) On July 1, 2021, A&V notified Lucky U that it intended to terminate the Supply Agreement because Lucky U "failed to purchase the minimum annual gallons . . . fail[ed] to upgrade the EMV equipment . . . [and] "fail[ed] to secure the gas dispensers when the station [was] closed." (Winans Termination Letter, Ex. 1F.) A&V stated that it would seek damages and "any relief available to it under state and federal law." (*Id.*) On July 9, 2021 S&F instituted a summary process action in

---

[2] A&V does not provide details of this communication in the Notice of Termination, such as the date the statement was made or the form the communication took. (*See* Notice of Termination, Ex. 7.)

Connecticut Superior Court against Lucky U, which Lucky U removed to this Court and which was subsequently remanded back to state court [Doc. # 21].[3] As discussed above, on October 15, 2021, A&V again gave notice of the termination of Lucky U's "petroleum marketing franchise." (Notice of Termination, Ex. 7.)

### C. Procedural History

Lucky U filed its Complaint against A&V on July 7, 2021, after A&V sent its first notice of termination. (Compl. [Doc. # 1].) A&V moved to amend its answer to assert counterclaims on October 20, 2021 [Doc. # 31], after sending out its second notice of termination on October 15, 2021. A&V's first count, a breach of contract claim, alleges twenty-two breaches of contract which largely mirror A&V's October 15th Notice of Termination [Doc. # 31].[4] The next day, before the Court granted A&V's motion to amend, A&V filed its emergency motion for a preliminary injunction without a memorandum of law [Doc. # 33].

On November 3, 2021, the Court held a status conference, granted A&V's motion to amend, and set a briefing schedule for A&V's motion for a preliminary injunction [Docs. ## 45, 48]. On November 11, 2021, before the Court held its evidentiary hearing on A&V's injunction motion, A&V's franchisor, Alliance Energy, LLC ("Alliance"), notified A&V that it was terminating A&V's Mobil franchise in twenty-one days because its tenant, Lucky U, was selling unbranded motor fuel, dispensing fuel under the name of "Anu Fuel," and utilizing a

---

[3] According to Lucky U, A&V withdrew this state court action "on the eve of trial." (Lucky U's Mem. in Opp'n [Doc. # 54] at 5 n.6.)

[4] Twenty-one of the twenty-two allegations in A&V's breach of contract claim are asserted in A&V's Notice of Termination. *See supra* pp. 5-6. In A&V's amended answer, it additionally alleges that Lucky U "hacked into a computerized credit card system and altered data thereby changing account information routing funds to counterclaim defendant's account." (Am. Answer [Doc. # 47] ¶ 5(q).

point-of-sale system that was associated with a third-party and not the Mobil network. (Alliance Energy Notice of Termination, Ex. 11.)[5]

An evidentiary hearing on A&V's motion against Lucky U was held on December 14-15, 2021 [Docs. ## 58, 61]. Lucky U took no steps to enjoin A&V from effectuating its termination notice.

## II.   Legal Standard

A preliminary injunction is a discretionary, equitable remedy. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). "A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Id.* However, the purpose of a preliminary injunction is "to preserve the relative positions of the parties," and where a movant seeks to alter the status quo, that party must "meet a heightened standard by showing 'a clear or substantial likelihood of success on the merits.'" *N. Am. Soccer League, LLC v. United States Soccer Fed., Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).

The status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* (internal quotations and citations omitted). In the last uncontested status before this litigation began, Lucky U leased and operated a Mobil gas station on the Federal Road premises. The relief A&V seeks would prohibit Lucky U from entering these

---

[5] A&V separately brought suit against Alliance and moved for a preliminary injunction to prevent Alliance from effectuating termination based on its identified events of default, and the parties stipulated that Alliance would not proceed with its termination until the Court adjudicated A&V's preliminary injunction. *See A&V Petroleum LLC v. Alliance Energy*, 3:21-cv-01577, Doc. # 15. The Court has taken judicial notice of this case.

leased premises or doing business thereon, thus altering the status quo and therefore requiring a heightened showing for preliminary injunctive relief.[6]

## III.   Discussion

### A.   Substantial Likelihood of Success on the Merits

A&V states that its October 15th Notice of Termination, which terminated the parties' "petroleum marketing franchise," allowed A&V to terminate Lucky U's Supply Agreement, Lease, and Key Money Agreement. (Bench Mem.  [Doc. # 59] at 3 (citing *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 361 (D. Conn. 1989) (stating that a Petroleum Marketing Practices Act franchise consists of "(1) the right to occupy leased marketing premises; (2) the right to sell motor fuel under a trademark owned or controlled by a refiner; and (3) the right to be supplied with that fuel")).) A&V argues that it is unnecessary to determine if its Notice of Termination complied with the Petroleum Marketing Practices Act ("PMPA") because Lucky U never moved to enjoin A&V's termination and because Lucky U agrees that the franchise has been terminated.[7] While Lucky U agrees that the termination occurred, it maintains that A&V's termination of the franchise was wrongful.

The PMPA prohibits the termination of a franchise except upon certain enumerated grounds. 15 U.S.C. § 2802 ("Except as provided in subsection (b) and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may . . . terminate any franchise (entered into or renewed on or after June 19,

---

[6] A&V never disputed Lucky U's position that a heightened standard applies to its motion for a preliminary injunction.

[7] A&V argues that the Court does not have to determine the validity of its notice under the PMPA in determining whether it is entitled to injunctive relief because the PMPA affords two avenues of relief for franchisees—injunctive relief and a claim for damages—and Lucky U never moved to enjoin the termination notice from taking effect. (Bench Mem. at 5.) A&V cites no authority in support of its position beyond *Hannan v. Exxon Co.*, 54 F. Supp. 2d 485 (D. Md. 1999) which recognized that a "franchisee might conceptually assert a claim for damages without having asserted a claim for injunctive relief," (*id.*), but does support the proposition that PMPA compliance is unwarranted here.

1978) prior to the conclusion of the term."). Under the PMPA, a franchise includes a contract between a distributor and a retailer for the sale of motor fuel under a trademark. *Id.* § 2801(1)(A). Lucky U and A&V entered into a Fuel Supply Agreement for the sale of Mobil-branded fuel, (*see* Fuel Supply Agreement, Ex. 4), and Lucky U acts as a retailer by selling fuel to the general public, *see* § 2801(7), while A&V acts as a distributor because it "purchases motor fuel for sale . . . to another," § 2801(6)(A).

Lucky U claims ambiguity as to whether the Lease falls under the definition of a franchise because the contract is not between a distributor and a retailer. Rather, it argues, the Lease is between Lucky U and S&F Investments, a real estate company. However, an alternative definition of franchise is found in § 2801(1)(B)(i), which defines "franchise" as

> any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such a refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy.

*Id.*

A distributor is "any person, including any affiliate of such person, who . . . purchases motor fuel for sale, consignment, or distribution to another," *id.* § 2801(6)(A), while an affiliate is "any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person," *id.* § 2801(15). Here, both A&V and S&F investments are under the common control of Mr. Qumbargi and therefore are affiliates. *See Koylum, Inc. v. Peksen Realty Corp.*, 272 F.3d 138, 145 (2d Cir. 2001) (concluding that a lease agreement between a retailer's assignor and a realty corporation could constitute a franchise under the PMPA where the petroleum corporation and the realty corporation were both closely held corporations owned by the same husband and wife). The Lease, therefore, could constitute a franchise as a contract under which Lucky U is authorized to occupy the "leased

marketing premises" for the sale of motor fuel under a trademark controlled by a refiner, Mobil,[8] which supplies motor fuel to A&V through A&V's franchisor, Alliance Energy, LLC.

Because their relationship thus falls under the PMPA and because a franchise for the sale of motor fuel cannot be terminated without compliance with the PMPA, the Court must determine if A&V has complied with the PMPA in determining if A&V is substantially likely to succeed on the merits of its breach of contract claim.

### 1.  Effectuation of Termination

To effect termination of a franchise, a franchisor must strictly comply with the notice requirements of 15 U.S.C. § 2804(c). *See Escobar v. Mobil Oil Corp.*, 678 F.2d 398, 400 n.2 (2d Cir. 1982); *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 314 (2d Cir. 2003). The written notice must include "a statement of intention to terminate the franchise . . . together with the reasons therefor," the date of termination, and a statutory summary informing the franchisee of responsibilities, remedies, and relief available to the parties. § 2804(c). The notice must be given to the franchisee by personal delivery or certified mail. *Id.*

A&V's Notice of Termination is a writing which states its reasons for termination and the date that it takes effect. (Ex. 7, Notice of Termination.) It does not indicate if it was given by certified mail or hand delivery. (*See id.*) The Notice of Termination states that the required statutory summary is attached, but such attachment was not included in Exhibit 7. (*See id.*) Lucky U, however, has never challenged the form of A&V's notification, agrees that there was a termination of its franchise, and acknowledges that it received the October 15th notice. Absent any evidence or implication that A&V failed to comply with the notification requirements by omitting the statutory summary or improperly delivering the notification, A&V will be deemed to have properly effectuated notice of termination.

---

[8] The Lease does not directly reference Mobil but requires Lucky U to adhere to the Brand Indemnification and Minimum Standards required by the Brand." (Ex. 3, Lease ¶ 25(d), (k).)

### 2. Reasonableness of Three-Day Termination

The PMPA normally requires not less than ninety days' notice for termination. 15 U.S.C. § 2804(a)(2). An exception exists when such notification "would not be reasonable for the franchisor." *Id.* § 2804(b)(1). If ninety-day termination is deemed unreasonable, the franchisor must give notice to the franchisee "on the earliest date on which furnishing of such notification is reasonably practicable." § 2804(b)(1)(A). If the marketing premises are leased by the franchisor, and the franchisor seeks to terminate without ninety days' notice, it may not create a new franchise relationship for those premises within thirty days but "may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents." *Id.* § 2804(b)(1)(B). The ninety-day notice requirement, however, "should not be lightly excused" and is meant for instances where a "franchisee committed serious defaults of the franchise agreement." *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2d Cir. 1984).

A&V provided Lucky U with three days' notice of termination. (Notice of Termination, Ex. 7.)[9] A&V asserts that Lucky U's misbranding of fuel warrants less than ninety days' notice of termination, citing *Wisser*, 730 F.2d at 60. (Def.'s Mem. at 8.) In *Wisser*, the Second Circuit concluded the franchisee's act of selling unbranded motor fuel justified forthwith termination of the parties' franchise agreement under § 2804(b)(1) where the franchisee's misbranding was confirmed on April 30 and notice was given on June 27. *Id.* While misbranding is certainly grave enough to justify termination in under ninety days, *see id.*, here, Lucky U did not engage in the misbranding of motor fuel until after the notice of termination was issued. Ms. Gautam admitted that she sold unbranded motor fuel, but she

---

[9] The Notice of Termination states that the termination shall take effect on January 18, 2022 if a court concludes that 15 U.S.C. § 2804(b)(1) is inapplicable. (Notice of Termination, Ex. 7.)

was steadfast in her testimony that her sale of unbranded motor fuel did not occur until October 28, 2021—thirteen days after A&V's October 15th Notice of Termination.

As the Court concludes *infra* pages 17-19, the only valid basis proved for termination of the franchise is through Lucky U's failure to implement an "EMV" upgrade to its fuel pumps.[10] This basis is sufficient to excuse the ninety-day notice requirement under the facts of this case. A&V sent two prior notices to Lucky U stating its intention to dispossess Lucky U based upon its failure to upgrade to an EMV reader, stemming as far back as May 18, 2021. After these previous notices, it would not be reasonable for A&V to have to give Lucky U another ninety days' notice. (Winnans Letter, Ex. 1F; Default Letter, Ex. 15.) Further, Lucky U never asserted that the three-day notice period was unreasonable. In fact, it maintains that the Supply Agreement was actually terminated on September 30, 2021, ninety days after A&V's July 1, 2021 notice of termination. Under these circumstances, A&V's three-day notification was reasonable under § 2804(b)(1).

### 3. *Grounds for Termination*

Under the PMPA, proper grounds for termination include (1) the "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship," (2) the "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise" where the franchisee is given an opportunity to carry out the provisions, or (3) "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(A)-(C).

If seeking to terminate a franchise in less than ninety days for the failure "to comply with any provision of the franchise" under § 2802(b)(2)(A), or for the "occurrence of an event which is relevant to the franchise relationship" under § 2802(b)(2)(C), the franchisor

---

[10] An EMV upgrade, which stands for Europay, Mastercard, and Visa, involves a credit card system switching from a slide card reader to a chip card reader.

cannot have "acquired actual or constructive knowledge of such" failure or occurrence "more than 60 days prior to the date on which notification of termination or nonrenewal is given." § 2802(b)(2)(A), (C). If the franchisor attempts to terminate a franchise agreement for the "failure of the franchise to exert good faith efforts to carry out provisions of the franchise," the franchisor must give the franchisee written notice of the failure, provide "a reasonable opportunity to exert good faith efforts to carry out such provision," and show that the "failure thereafter continued within the period which began not more than 180 days before the date notification of termination." § 2802(b)(2)(B).

A&V takes a scattershot approach to its termination notice, citing twenty-one reasons the franchise is terminated under § 2802(b)(2)(A), § 2802(b)(2)(B), and § 2802(b)(2)(C). *See supra* pp 5-6.

### a. *Grounds that Lack Evidentiary Support*

At the evidentiary hearing, there was insufficient probative evidence for the claims that Lucky U operated a service station without an attendant; intentionally interfered with the Fuel Supply Agreement between Alliance Energy, LLC and A&V Petroleum;[11] failed to comply with all laws regarding pollution and the sale of illegal goods or items; failed to comply with the Connecticut Flammable and Combustible Liquids Code Regs. Conn State Agen. § 29-320-4a subsection NFPA 30A, 9-.8; and blocked an exit from the service station in violation of Connecticut's Fire Prevention Code and Life Safety Code. While there was evidence that Lucky U initially "refused to permit necessary inspections for mandatory EMV upgrades," the parties' testimony confirmed that Mr. Qumbargi was able to conduct this inspection later the same day. Lacking evidentiary support, these claims do not support preliminarily enjoining Lucky U from entering the leased premises or engaging in certain conduct thereon.

---

[11] While there was evidence that Ms. Gautam contacted Alliance Energy, LLC, it did not show that Ms. Gautam acted tortiously and with an intent to interfere with that contract. *See Rioux v. Barry*, 283 Conn. 338, 351 (2007).

*b. Grounds that Occurred After the Notice of Termination*

A&V presented evidence that Lucky U breached its Lease by reconfiguring its leased credit card equipment, selling unbranded gasoline, and placing signs around the gas station for "Anu Fuel" instead of "Mobil."[12] However, these breaches were shown to have occurred *after* October 15, and thus could not have supported the Notice of Termination when issued.[13] While the sale of misbranded motor fuel is a valid basis for the forthwith termination of a franchise, *see Shell Oil Co. v. Wentworth*, 822 F. Supp. 878 (D. Conn. 1993), and Ms. Gautam admitted that she sold non-Mobil gas under a Mobil trademark, her sale of misbranded gasoline could not support A&V's October 15th Notice of Termination because she engaged in this activity only after receiving that Notice. Although A&V construed Lucky U's earlier stated intention to purchase unbranded motor fuel to be an "anticipatory breach" allowing for termination under the PMPA, (Ex. 7, Notice of Termination), "[s]ince the PMPA only allows termination for existing defaults . . . termination based on the possibility of future defaults simply will not do." *Winks v. Feeney Oil Co., Inc.*, 731 F. Supp. 322, 329 (C.D. Ill. 1990). Without evidence that Lucky U engaged in these activities before A&V gave its termination notice on October 15th, these activities do not justify A&V's notice of termination of the franchise under the PMPA as of that date.

---

[12] These occurrences breached the Supply Agreement provisions that Lucky U must make all credit card sales in "compliance with instructions and regulations supplied by or through [A&V], or otherwise promulgated by the card issuer"; must sell product "under the identifying marks of Mobil"; and may not "mix, blend, dilute, adulterate, or contaminate any Products." (Supply Agreement, Ex. 4, at 3-4.)

[13] During Ms. Gautam's examination, A&V attempted to demonstrate that these events occurred "around about October 15th." Ms. Gautam, however, was clear in her testimony that she did not hire anyone to change the credit card system until October 16, 2021, did not change the signs until October 27, 2021, and did not sell non-Mobil branded fuel until October 28, 2021.

*c.  Grounds under 15 U.S.C. § 2802(b)(2)(A) and (C)*

A franchisor cannot have "acquired actual or constructive knowledge of such" failure or occurrence "more than 60 days prior to the date on which notification of termination or nonrenewal is given" when less than 90 days' notice is given.  § 2802(b)(2)(A), (C). A&V has failed to demonstrate whether it acquired "actual or constructive knowledge" of many of Lucky U's claimed failures within sixty days of its Notice, as required under sections 2802(b)(2)(A) and (C) of the PMPA. Several of A&V's grounds for termination relate to Lucky U's failure to perform an "EMV upgrade" to ensure compliance with regulations relating to the "PCI Data Security Standard." (Notice of Termination, Ex. 7.) A&V has complained of Lucky U's failure to perform EMV upgrades since May of 2021, exceeding the sixty-day knowledge window. (Default Letter, Ex. 15); 15 U.S.C. § 2802(b)(2)(A). The same is true for Lucky U's sale of "impermissible items." (*See* Notice of Termination, Ex. 7; Default Letter, Ex. 15.) A&V has not demonstrated the date it became aware of Lucky U's purported failure to reconcile underground storage tanks, failure to maintain gasoline inventory reconciliation records, failure to give unrestricted access to the records of credit card transactions, failure to maintain worker's compensation insurance, and failure to perform and maintain inventory records. Without proof of when it acquired knowledge of these failures, A&V has not established that they constitute grounds for timely termination under § 2802(b)(2)(A) or (C).

In evaluating the propriety of termination of a franchise agreement under § 2802(b)(2), the Second Circuit held that the proper standard for evaluating the reasonableness of an alleged violation of a franchise agreement "is one of objective reasonableness . . . taking into consideration all the relevant facts and circumstances." *Darlin v. Mobil Oil Corp.*, 864 F.2d 981, 991 (2d Cir. 1989). "All relevant facts, including those occurring between the commencement of the franchise agreement and its purported termination, must be considered when scrutinizing the grounds for termination." *Id.*  Lucky

16

U was obligated in its Fuel Supply Agreement to "accept credit and debit cards which may from time to time be offered through [A&V] for purposes of making retail sales," (Fuel Supply Agreement, Ex. 4, at 4), and it acknowledged in Ms. Gautam's affidavit, admitted as a hearing exhibit, that it stopped accepting Mobil credit cards after September 30, 2021.[14] (Lucky U Aff., Ex. 1, ¶ 7.) A&V had previously sent a notice of termination of the Fuel Supply Agreement on July 1, 2021 to take effect in ninety days, or on September 30, 2021. (Winans Termination Letter, Ex. 1F.) Lucky U through Ms. Gautam explained that it stopped accepting Mobil credit cards on September 30, 2021 because it believed its authority to accept these cards was terminated by A&V's July termination letter. (Lucky U Aff., Ex. 1, ¶ 7.) While A&V had actual or constructive knowledge of Ms. Gautam's failure to accept Mobil credit cards within sixty days of its termination notice, A&V has not demonstrated why Lucky U's failure to accept Mobil credit cards is an objectively reasonable basis for termination under § 2802(b)(2)(A) under the circumstances of this case which A&V itself induced.[15]

A&V also elicited testimony that Lucky U stopped accepting any credit cards at the gasoline dispensers in early October 2021.[16] Ms. Gautam testified that she placed a sign over the pump keypad instructing customers to pay inside the convenience store because she had "system issues." A&V has not shown why it was objectively reasonable for it to terminate a franchise agreement over the failure to accept credit cards at the gasoline dispensers where

---

[14] Because Lucky U admits that it failed to accept these credit cards starting on September 30, 2021, A&V must have acquired knowledge of its refusal to accept these credit cards within sixty days of its Notice of Termination given on October 15, 2021.

[15] The Court notes, however, that Lucky U's explanation is problematic because it continued to operate as a Mobil gas station after September 30th, placing an order for Mobil-branded gas with A&V on October 6, 2021.

[16] A&V evidences its knowledge of this failure through photos it submitted, taken in early October 2021.

Lucky U was encountering system issues and nonetheless accepted them inside.[17] Nor has A&V demonstrated how Lucky U's failure to accept credit cards at the gas pumps was of such "material significance," as to "go to the crux of the parties' relationship" as required to justify termination under § 2802(b)(2)(A). *Darlin*, 864 F.2d at 991.

### d.  Grounds under 15 U.S.C. § 2802(b)(2)(B)

Under § 2802(b)(2)(B), a franchisor may terminate a franchise for the franchisee's failure "to exert good faith efforts to carry out the provisions of the franchise" when given written notice and "a reasonable opportunity to exert good faith efforts to carry out such provisions," if the failure occurs "not more than 180 days before the date notification of termination." "In contrast to section 2802(b)(2)(A), the term 'provisions' is not modified by the adjective 'reasonable' in section 2802(b)(2)(B)." *Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1053 (2d Cir. 1989). Instead, a franchisor may predicate termination on a provision of the franchise, whether reasonable or not, if a franchisee does not make good-faith efforts to comply. *Id.*

A&V claims § 2802(b)(2)(B) as a basis for the October 15 termination, but neither its Memorandum in Support of Injunctive Relief [Doc. # 49] nor its Bench Memorandum [Doc. # 59] articulate how it apprised Lucky U of the failures and how it afforded Lucky U a "reasonable opportunity to exert good faith efforts to carry out" fourteen of the sixteen provisions it cites. *See* § 2802(b)(2)(B). The record shows only that A&V previously informed Lucky U of two breaches which it based termination on in October 2021—the sale of impermissible items (May 18, 2021 and August 13, 2021)[18] and failure to perform an EMV upgrade to the credit card system (May 18, 2021 and July 1, 2021).

---

[17] Further, it is unclear what provision of the contract A&V claims Lucky U violated by refusing to accept credit cards at its gasoline pumps.

[18] Lucky U testified that it removed certain impermissible items, however, so the Court cannot conclude that A&V is substantially likely to succeed on the merits of this claim when Lucky U has described its efforts to carry out this provision.

Lucky U is required under Section 10 of the Supply Agreement to upgrade the credit card equipment and software in compliance with industry standards and federal, state, and local laws. (Fuel Supply Agreement, Ex. 4, § 10.) Lucky U was notified of this failure in writing on at least two occasions, (*see* Notice of Termination, Ex. 7; Default Letter, Ex. 15), was given an opportunity to carry out this provision, and failed to make good faith efforts to comply with the provision. Lucky U's "failure thereafter continued within the period which began not more than 180 days before the date notification of termination." *See* § 2802(b)(2)(B). The EMV upgrade, required by industry standard, became due on April 17, 2021,[19] which was 181 days before A&V's notice of termination on October 15, 2021. However, Mr. Qumbargi testified that he believed that Lucky U was waiting on the deadline to implement the EMV upgrade, "and then it became very transparent that she just had no interest in doing so." Lucky U's actual failure to comply in good faith with the provisions of its contract occurred *after* the EMV upgrade deadline passed where it showed no interest in complying with industry standard as required by its contract, within 180 days of A&V's notice. Satisfying the statutory requirements under § 2802(b)(2)(B), A&V was able to validly terminate Lucky U's franchise for the failure to implement an EMV upgrade.

Lucky U expressed its belief that it is not obligated to perform the EMV upgrade at the gas pumps. Ms. Gautam, on behalf of Lucky U, acknowledged that Section 10 of the Supply Agreement obligates her to perform an EMV upgrade. However, she regarded the EMV upgrade as a "past job" because the EMV upgrade was initially due in 2015 before the deadline was extended several times to 2021. She also claimed that the EMV upgrade was A&V's responsibility because Mr. Qumbargi inspected the pumps to perform the upgrade on

---

[19] *See Visa Chip Technology for Merchants Overview*, Visa, https://usa.visa.com/run-your-business/small-business-tools/payment-technology/visa-chip-technology-merchants.html (last visited Jan. 6, 2022) (noting that the liability shift policy for failing to upgrade to an EMV system for Automated Fuel Dispensers became effective on April 17, 2021).

October 12, 2021 and that the Key Money Agreement controls the maintenance of equipment, under which she is not obligated to perform any upgrades.

Lucky U's stated reasons for not implementing the EMV upgrade ignore the contractual language of the Supply Agreement. While the EMV upgrade may have been subject to extensions, it became due while Lucky U operated the gas station and is indisputably Lucky U's responsibility under the contract. Lucky U's reliance on Mr. Qumbargi's inspection of the pumps disregards the contractual language of the Supply Agreement. Further, while Lucky U cites to the Key Money Agreement, the Key Money Agreement only rents Lucky U the gas pumps and does not discuss any maintenance and upgrade obligations. (Key Money Agreement, Ex. 5.)

Because A&V meets the statutory requirements of § 2802(b)(2)(B) and has demonstrated that Lucky U breached its Supply Agreement, A&V was permitted to validly terminate Lucky U's franchise, including the Supply Agreement and the Lease, and has established a substantial likelihood of prevailing on the merits of its breach of contract claim.

### 4. *Lucky U's Alternative Arguments and Defenses*

#### a. *Dissolution of A&V in Massachusetts*

Lucky U presented evidence that A&V, a Massachusetts limited liability company, was dissolved in Massachusetts and a Connecticut limited liability company named A&V Petroleum LLC was formed. (Business Entity Summary, Ex. 30; Business Details, Ex. 31.) Lucky U argued that A&V was not entitled to relief because the Massachusetts LLC was dissolved, and the Connecticut LLC was not a party to the dispute. A&V responded that under Massachusetts and Connecticut law, a dissolved LLC may wind up its affairs by prosecuting and defending actions, which it was doing. (Bench Mem. at 2 (citing Mass. Gen. Laws ch. 156C, § 45(B); Conn. Gen. Stat § 34-267a(b)(2)(B)).) After the hearing, on December 22, 2021, A&V submitted notice that A&V updated its records with the Secretary of the Commonwealth of

Massachusetts, reviving the A&V Petroleum, LLC under Massachusetts law. (Notice Re: LLC Status [Doc. # 63].)

Because A&V Petroleum, LLC has revived itself under Massachusetts law, Lucky U's argument that A&V cannot obtain relief against Lucky U because it no longer exists is moot.

### b. Equitable Defenses

Lucky U answered A&V's counterclaims and asserted eleven affirmative defenses. (Answer to Counterclaim [Doc. # 55] at 4.) Lucky U neither briefed the applicability of these defenses to A&V's motion nor discussed them in its closing argument at the hearing. However, when asked for the relevance of certain testimony, Lucky U cited its equitable defense of unclean hands and force majeure.

A court may use its discretion to deny equitable relief based upon unclean hands "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 363 (D. Conn. 2018) (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999)). "The doctrine generally 'applies [only] to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing.'" *Thompson v. Orcutt*, 257 Conn. 301, 310-11 (2011) (quoting *Samasko v. Davis*, 135 Conn. 377, 383 (1949)). Ms. Gautam testified that she was given possession of the property later than promised, that she believed she was being overcharged for fuel, and that her security deposit was never returned. These complaints against A&V are unrelated to Lucky U's failure to implement an EMV upgrade, and thus, the defense of unclean hands is inapplicable.[20]

_____

[20] Further, the doctrine of unclean hands "is applied not by way of punishment but on considerations that make for the advancement of right and justice." *Pappas v. Pappas*, 164 Conn. 242, 246 (1973). After A&V issued termination, Lucky U manipulated its leased credit card system and began to sell unbranded fuel under the signage of "Anu Fuel." Considering

At the hearing, Lucky U also worked to establish the impact of the COVID-19 pandemic on the sale of gasoline, claiming the defense of force majeure. The Supply Agreement contains a Force Majeure Clause, excusing A&V for "delay or non-performance" if an event beyond its control occurs. (Supply Agreement, Ex. 4, ¶ 7.) The clause continues, that "[i]n no event shall any force majeure condition affect Dealer's obligation to pay for Product when due." (*Id.*) Lucky U has neither demonstrated how it is excused from performing an EMV upgrade under the Supply Agreement nor how the COVID-19 pandemic prevented it from upgrading the pumps to the EMV system. These defenses do not defeat A&V's entitlement to injunctive relief.

### B. Irreparable Harm

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., LLC v. Labatt Brewing Co.,* Ltd, 339 F.3d 101, 113 (2d Cir. 2003). A&V states that it is subject to irreparable harm because Lucky U is selling fuel from another source, placing A&V's own franchise rights at risk with Alliance Energy. However, Alliance Energy does not mention the EMV upgrade as a predicate for its termination of A&V's franchise, only the sale of non-Mobil branded fuel, the display of non-Mobil signs, and the alteration of the point-of-sale credit card system. (Alliance Termination Notice, Ex. 11.) Thus, there appears to be a disconnect between Lucky U's failure to implement an EMV upgrade and A&V's claimed irreparable harm.

Nevertheless, A&V demonstrated that it validly terminated Lucky U's franchise and Lucky U has stayed on A&V's premises, refusing to pay rent,[21] and interfering with the property by impermissibly selling unbranded motor fuel. "[I]t is well-settled that

---

Lucky U's post-termination conduct, the application of the doctrine of unclean hands would not advance the interests of right and justice. *See id.*

[21] Lucky U testified that it is not directly paying rent, but it is insisting that A&V draw rent money from a $40,000 deposit that it gave to A&V.

unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *Brooklyn Heights Ass'n, Inc. v. National Park Service*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011). Here, A&V is subjected to irreparable harm in the absence of an injunction based on the interference with its property and its equipment. It is not a case, as Lucky U asserts, that money damages can adequately compensate.

### C.  Balance of Equities and Public Interest

In assessing the balance of equities and the public interest in the requested relief, the Court "balance[s] the competing claims of injury" and "consider[s] the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Yang v. Kosinski*, 960 F.3d 119, 135-136 (2d Cir. 2020).

Here, Lucky U faces harm if an injunction is granted forcing it from the premise where it has invested time and money in operating a business. But Lucky U is impermissibly on A&V's property, and since the termination notice was issued, it has engaged in activities that threaten A&V's possessory interest in the property, tipping the balance of the equities in A&V's favor. Further, the public interest weighs in favor of A&V because "the continued possession by a lessee of a property after the lease has been validly terminated is contrary to the public interest." *Total Petroleum P.R. Corp. v. Colon-Colon*, 577 F. Supp. 2d 537, 522 (D.P.R. 2008).

## IV.    Conclusion

For the foregoing reasons, Defendants' motion [Doc. # 33] for a preliminary injunction is GRANTED as follows:

Lucky U is directed to herewith surrender the gasoline service station premises located at 83 Federal Road Brookfield, Connecticut and is enjoined from entering, occupying, or possessing the leased premises or dispossessing or attempting to dispossess Defendants from the leased premises hereafter. Lucky U is further enjoined from accessing Defendants' computer, register, cashier, credit card system, account, accounting device, reconciliation device, or environmental device, altering data on any of these devices, or attempting to prevent Defendants from restoring data on these devices.

IT IS SO ORDERED.



/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of January 2022.